K ORIGINAL

√ Feb 06



**U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FILED**

FEB -3 2006

CLERK, U.S. DISTRICT COURT
By _____
                        Deputy

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

3- 06 C V 0 2 2 0 - K

| | | |
|---|---|---|
| LABORERS NATIONAL PENSION FUND, | § | Civil Action No. |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| AOL TIME WARNER INC., AMERICA | § | |
| ONLINE, INC., TIME WARNER INC., | § | |
| STEPHEN M. CASE, GERALD M. LEVIN, | § | |
| RICHARD D. PARSONS, KENNETH J. | § | |
| NOVACK, ROBERT W. PITTMAN, J. | § | |
| MICHAEL KELLY, STEPHEN F. | § | |
| BOLLENBACH, WAYNE H. PACE, | § | |
| STEVEN RINDNER, DAVID M. COLBURN, | § | |
| ERIC KELLER, JOSEPH A. RIPP, BARRY | § | |
| M. SCHULER, PASCAL DESROCHES, | § | |
| JOHN P. TULI, MYER BERLOW, PAUL T. | § | |
| CAPPUCCIO, CITIGROUP GLOBAL | § | |
| MARKETS, INC., CITIGROUP INC., | § | |
| SALOMON SMITH BARNEY INC., | § | |
| MORGAN STANLEY & CO. INC. and | § | |
| ERNST & YOUNG LLP, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| _____ | § | DEMAND FOR JURY TRIAL |

**COMPLAINT FOR VIOLATIONS OF §§11, 12(a)(2) AND 15 OF THE
SECURITIES ACT OF 1933, §§10(b), 14(a) AND 20(a) OF THE SECURITIES
EXCHANGE ACT OF 1934, AND STATE SECURITIES AND COMMON LAW**

This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following: unique and original selection, coordination, expression, arrangement, and classification of the information.

No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports, news articles or books quoted within this work.

Copyright © 2006 by William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP. William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this writing/publication.

All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of William S. Lerach and Lerach Coughlin Stoia Geller Rudman & Robbins LLP is prohibited.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

SUMMARY OF THE ACTION .............................................................................7

JURISDICTION AND VENUE ...........................................................................39

THE PARTIES......................................................................................................39

FRAUDULENT SCHEME AND CONDUCT......................................................46

BACKGROUND TO THE MERGER...................................................................47

AOL'S AND AOLTW'S FALSE AND MISLEADING FINANCIAL STATEMENTS...........144

ERNST & YOUNG'S ROLE IN THE WRONGDOING .........................................182

MORGAN STANLEY'S AND SALOMON SMITH BARNEY'S ROLES IN THE WRONGDOING........190

INSIDER SELLING .............................................................................................194

AOL SETTLEMENT OF DOJ and SEC CRIMINAL AND CIVIL CHARGES ......................201

LOSS CAUSATION/ECONOMIC LOSS ...........................................................202

FIRST CLAIM FOR RELIEF ..............................................................................203

    For Violation of §§11 and 15 of the 1933 Act Against AOLTW, Case, Levin, Parsons, Novack, Pittman, Kelly, Bollenbach, Cappuccio, Ernst & Young and Morgan Stanley ..................203

SECOND CLAIM FOR RELIEF .........................................................................207

    For Violation of §12(a)(2) of the 1933 Act Against Defendant AOLTW .......................207

THIRD CLAIM FOR RELIEF .............................................................................208

    For Violation of §§10(b) and 20(a) of the 1934 Act and Rule 10b-5 Against Defendants AOL, AOLTW, Ernst & Young, Morgan Stanley, Salomon Smith Barney and the Individual Defendants (Except Bollenbach and Cappuccio)........208

FOURTH CLAIM FOR RELIEF .........................................................................210

    For Violation of §14(a) of the 1934 Act and Rule 14a-9 Against AOL, Time Warner AOLTW, Case, Levin, Kelly, Cappuccio, Novack, Pittman, Ernst & Young and Morgan Stanley ...........210

**Page**

FIFTH CLAIM FOR RELIEF ...................................................................................212

    For Violations of Articles 581-33A, 581-33C and 581-33F of the Texas Securities
        Act Against Defendants AOLTW, Ernst & Young and Morgan Stanley............212

SIXTH CLAIM FOR RELIEF....................................................................................213

    For Common Law Fraud Against Defendants AOL, AOLTW,  Ernst & Young,
        Morgan Stanley and Salomon Smith Barney.......................................................213

SEVENTH CLAIM FOR RELIEF .............................................................................214

    For Aiding and Abetting Common Law Fraud Against Defendants AOL,
        AOLTW, Ernst & Young, Morgan Stanley and Salomon Smith Barney............214

EIGHTH CLAIM FOR RELIEF .................................................................................215

    For Statutory Fraud Violations Under Section 27.01(a) of the Texas Business and
        Commerce Code against AOL,  AOLTW, Ernst & Young, Morgan
        Stanley and Salomon Smith Barney .....................................................................215

NINTH CLAIM FOR RELIEF....................................................................................216

    For Negligent Misrepresentation Against AOL, AOLTW, Ernst & Young and
        Morgan Stanley.....................................................................................................216

TENTH CLAIM FOR RELIEF ..................................................................................217

    For Strict Responsibility for Misrepresentation Against AOL and AOLTW .................217

ELEVENTH CLAIM FOR RELIEF ...........................................................................218

    For Intentional Misrepresentation Against Defendants AOL, AOLTW,  Ernst &
        Young, Morgan Stanley and Salomon Smith Barney...........................................218

TWELFTH CLAIM FOR RELIEF.............................................................................219

    For Unjust Enrichment Against Defendants Case, Kelly, Novack, Pittman,
        Colburn, Parsons and Ernst & Young...................................................................219

PRAYER FOR RELIEF .............................................................................................219

JURY DEMAND.........................................................................................................220

## INTRODUCTION

1.      This is an action arising out of the sale of Time Warner Inc. ("Time Warner") to America Online, Inc. ("AOL"), which resulted in the formation of AOL Time Warner Inc. ("AOLTW" or the "Company") in 1/01 (the "Merger"). As a result of this Merger – which *Dow Jones* has since characterized as a "***terrible deal***," *Time* magazine has described as the "***worst deal of the century***," and *Fortune* has called "***one of the great train wrecks in corporate history***" – the former shareholders of Time Warner who exchanged their shares for new AOLTW shares and those investors who purchased the newly issued stock of AOLTW after the Merger – including the plaintiff in this action – lost billions of dollars as AOLTW's stock collapsed from as high as $58.51 per share to as low as $8.60 per share. But the top AOLTW insiders, the two Wall Street banks – who helped them orchestrate the Merger and secure its approval by misleading Time Warner's shareholders and then inflated the trading price of the new stock of AOLTW after the Merger – and AOLTW's accountant, Ernst & Young, who helped falsify AOLTW's financial results before and after the Merger, all did quite well for themselves. AOLTW insiders, including those named as defendants here, pocketed over ***$797 million in illicit benefits for themselves***, the Wall Street banks pocketed the largest investment banking fee in history (over $135 million) and the accounting firm retained the coveted AOLTW account – ***one of the largest and most lucrative public company accounts in the world***, worth over $1 million ***per week*** in fees.

2.      At the height of the Internet/dot-com frenzy during 98-99, AOL passed itself off as an emerging "Blue Chip" company, creating a high stock price – AOL peaked at $94 per share in 12/99 – and a market valuation of over $214 billion – larger than that of IBM or General Motors and Ford Motor ***combined***! By 98-99, the key to AOL's continuing high stock price was the belief that it was successfully transitioning its business by leveraging an ever-growing Internet access subscriber base to reap huge amounts of high-profit-margin e-commerce advertising revenues which would lead

to profitable growth for years to come. Just as AOL's stock was hitting its all-time high, based on the apparent tremendous growth of AOL's subscriber base and the success and profitability of its e-commerce advertising business, AOL used its inflated shares as currency to purchase Time Warner and its substantial stable of media and entertainment properties, which had real value and proven earning power. In order to inflate AOL's stock prior to the Merger and to secure Time Warner shareholder approval of the sale of Time Warner to AOL and then to continue to inflate the price of AOLTW stock after the Merger, defendants presented AOL's business as achieving record growth and profitability. They assured Time Warner's shareholders that the terms of the sale of their company were "*fair*" and made extraordinarily strong assurances that the Merger would succeed and was succeeding, forecasting that the Merger would result in 12%-15% annual revenue growth, 30% annual EBITDA growth and 50% annual "free" cash flow growth for AOLTW both in the year immediately following the Merger and for the next several years. AOLTW was to achieve these results due to the growing subscriber base and e-commerce advertising of AOLTW's "*crown jewel*" – AOL – as well as Time Warner's thriving cable TV business, all of which was creating a new "*blue chip*" *powerhouse* and "*large cap growth stock*" – a "*safe and secure place for people to put their money,*" which was worth at least $115 per share.

3.    After the Merger, the successful synergies and economies, as well as revenue, cash flow and EBITDA growth, that had been promised, failed to occur. The AOL unit not only failed to act as the driving force behind the growth of the combined companies, it turned out that AOL had been falsifying the growth of its Internet access subscribers (25 million at 9/30/00) and the growth and success of its e-commerce advertising revenues (over $2.3 billion in calendar 00) and backlog (over $3 billion by 9/30/00), by using tricks, contrivances and bogus transactions to boost these subscriber numbers and e-commerce advertising results and backlog. Instead of driving the new AOLTW to the huge revenue, EBITDA and cash flow growth forecasted, AOL's corrupt accounting

practices, contracting e-commerce advertising and shrinking subscriber base badly damaged

AOLTW, resulting in huge damage to former Time Warner shareholders, as well as investors in the

new AOLTW enterprise.

4. Shortly after the Merger, as management dissension and conflicts roiled the top ranks

of AOLTW, AOLTW reported sharply slowing revenue, EBITDA and cash flow growth, principally

due to advertising shortfalls at its AOL unit and a lack of the promised merger synergies and

economies. After first scaling back its financial forecasts in the Fall of 01, during 02, AOLTW took

$54 billion and $45 billion write-downs due to the over-valuation of its assets, resulting in an 02 loss

of $100 billion – *the largest corporate loss in history* – as it revealed that AOL's supposedly multi-

billion-dollar e-commerce advertising backlog had virtually disappeared, its e-commerce advertising

revenues were falling by 50% and its subscriber numbers were actually declining! AOLTW also

admitted that AOL had falsified its key e-commerce advertising revenues *before and after the*

*Merger* by including in revenue one-time payments in connection with the termination of advertising

contracts, as well as revenue from "barter," "swap" and "round trip" transactions, and by requiring

customers to purchase advertising in return for offsetting investments from AOL, ultimately restating

its prior financial reports to eliminate almost $200 million in phony e-commerce advertising

revenues. It also came out that AOLTW had further artificially boosted its results by improperly

accelerating the recognition of hundreds of millions of dollars of advertising revenues in its cable TV

operations by reporting as advertising revenue initial cable licensing payments from new channels

joining AOLTW's cable TV networks – payments that should have been accounted for as offsets

against the monthly fees the AOLTW cable TV networks paid the new channels on an ongoing basis.

AOLTW later admitted an additional $400 million in phony advertising revenues that would be

restated, due to a reciprocal transaction with Bertelsmann AG. The Company subsequently restated

AOL's 00 results due to a 3/17/00 transaction involving Bertelsmann. Thus, defendants have



essentially admitted that the 3/31/00 results included in the 5/19/00 Merger Registration Statement were false. The 3/31/00 results and prior results were also false due to other accounting manipulations described herein. The defendants' representations of successful merger integration, synergies and economies, as well as the forecasts of 12%-15% revenue growth, 30% EBITDA growth and 50% free cash flow growth in 01 and beyond, were thus false and not remotely obtainable. As a result of these financial reversals, AOLTW is now riddled with $28 billion in debt and its earning power is substantially impaired, requiring AOLTW to sell off billions of dollars of truly valuable assets to raise cash to try to restore its financial health. Rumors abound that AOLTW will even discard AOL.

5.    AOLTW's CEO (Gerald Levin), Co-COO (Robert Pittman) and its Chairman (Steve Case) have all been ousted from the Company. AOLTW's CFO, Michael Kelly (the former CFO of AOL), has been demoted and relieved of his accounting responsibilities. All of the AOL operation's top executives, including the former President (Barry Schuler) and all of the executives who ran AOL's e-commerce advertising business and structured the bogus deals there have also been kicked out of the Company. The head of AOLTW's cable TV operations has been ousted as well. The Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") are pursuing widespread criminal and civil investigations of AOLTW's financial and accounting falsifications and phony forecasts. Several of AOL's advertising counter-parties have restated their financial results to eliminate hundreds of millions of dollars of revenues generated by their phony e-commerce deals with AOL. AOLTW was even named as a defendant in the Homestore.com securities class action suit based on detailed allegations that it participated in a scheme to inflate Homestore.com's and its own e-commerce advertising revenues by millions of dollars, via several specified phony advertising deals – transactions so fraudulent that several Homestore.com executives have pleaded guilty to



criminal charges of securities fraud. In fact, a federal district court judge recently described the

actions of AOLTW with respect to Homestore.com harshly:

> *The acts alleged in the [Homestore.com complaint], which this Court must accept as true for purposes of this motion, describe a massive conspiracy driven by pure avarice. In particular, the detailed factual allegations describing the role of AOL and its agents in helping Homestore please Wall Street and in boosting its own revenues through bogus commissions give this Court great pause.*

*In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1041 (C.D. Cal. 2003).

      6.      As stated by *The New York Times*, Case, AOLTW's now ex-Chairman (and former

AOL Chairman/CEO), "*pulled off one of the sweetest deals in business history . . . by managing to*

*acquire Time Warner with AOL's inflated shares.*" Richard Parsons – AOLTW's current

Chairman/CEO (the last man standing) – has called the sale of Time Warner to AOL a "*silly*

transaction and a "*mistake*," with "*overly ambitious*" forecasts of 30% growth that were "*not the*

*real world.*" According to *The New York Times*, Parsons "*has acknowledged that in retrospect,*

*[Time Warner's then Chairman/CEO] Levin hurt Time Warner's shareholders by selling the*

*company for temporarily inflated shares of AOL stock,*" because AOL's online business was "*the*

*principal source of the collapse of our value,*" and he has lamented: "*What were we thinking?*" –

"*There is no question that the price was way out of bounds.*" After the fact Parsons also admitted,

"*We have learned the lessons of over-promising and we won't repeat them.*" Even Case has now

admitted that AOLTW should "*obviously not*" have proceeded with its ambitious financial forecasts

and that among the mistakes made "*to be sure*" were "*setting profit expectations that were too high*

*and . . . sticking with them too long.*" AOLTW's stock, which first traded at $49 after the Merger

and reached a post-merger high of $58.51, collapsed to as low as $8.60 as these shocking revelations

unfolded and currently changes hands at $17-$18 per share.

      7.      In 7/00, while AOL's stock was being inflated in anticipation of the Merger, AOL

insiders, knowing that the later closing of the Merger would accelerate and vest all of their then

unvested AOL options, converting millions of them into new AOLTW options and allowing them to then exercise those new options and bail out of AOLTW, but fearing that their ongoing falsification of AOL's subscriber metrics and financial results could be discovered at any time – crushing AOL's stock and scuttling the Merger – exercised millions of their then existing and already vested cheap AOL stock options and immediately sold off 2.2 million shares of their inflated AOL stock, pocketing over $125 million. Then, after the Merger closed in 1/01 and converted all the old AOL and Time Warner stock options into new AOLTW stock options and caused them to immediately accelerate and vest, ***top AOLTW insiders exercised millions and millions of these newly vested options and sold off more than 21.6 million shares of their AOLTW shares at inflated prices as high as $55.69 per share***, pocketing an additional $672 million before the revelations of financial and accounting improprieties, executive ousters and SEC and DOJ investigations crushed AOLTW's stock. Most of these post-merger stock sales by AOLTW insiders (over $440 million worth) took place in just a five-month period (2/01-6/01), at the same time that these same insiders were causing AOLTW to ***spend over $3.1 billion of its corporate funds*** on an open market common stock repurchase program – telling its shareholders that AOLTW's shares were "***undervalued***" – causing AOLTW to acquire ***over 30 million shares of AOLTW stock*** to manipulate and inflate the stock price higher as those insiders were selling off over 8.9 million of their own shares! In sum, AOL and AOLTW insiders pocketed a total of over $797 million in insider stock sale proceeds to take advantage of the inflated price of AOL and AOLTW stock. The investment advisors also got the largest merger fee in history, as when the Merger closed, Salomon Smith Barney and Morgan Stanley pocketed what has been termed the "***Godzilla fee***" of all time in investment banking, over $135 million. And Ernst & Young, the auditor for both AOL and Time Warner, held onto the new AOLTW account after the Merger – one of the largest and most lucrative public company accounts in the world, generating fees of $52 million in 01. And Levin, Time Warner's former

- 6 -



Chairman/CEO – the architect of the deal that virtually destroyed Time Warner and who had told investors at the time of the Merger that he had "*no intention of (ever) leaving*" *AOLTW, as he made his mark on the world* – pocketed a $625 million retirement package when he fled AOLTW – suddenly retiring in 12/01 as the Merger collapsed, supposedly to put "*more 'poetry' into his life.*"

## SUMMARY OF THE ACTION

8.      In 12/96, seeking to boost its subscriber numbers, AOL introduced "flat-rate" subscription plans. This had the effect of dramatically increasing member usage but drastically decreasing AOL's operating margins. In the late 90s, the Internet access market – AOL's main business – was also becoming increasingly saturated and AOL was facing intensifying competition from low-cost or free Internet access providers. This downward pressure on operating margins, increasing competition and the increasing likelihood that AOL's subscriber growth would plateau, put tremendous pressure on AOL's executives to generate ever-increasing numbers of subscribers *and* find additional higher profit margin revenue sources to continue its growth. AOL's top executives, including Case, its Chairman/CEO, Kenneth Novack, its Vice Chairman, and Pittman, its President/COO, began to try to develop other sources of higher profit margin revenues to preserve AOL's profitable growth and thus support its high stock price, upon which their prestige, jobs, and not to mention their personal fortunes, largely depended. Continuing subscriber growth and AOL's newest and most rapidly growing business area – online or e-commerce advertising – were the key to success. In this regard, AOL's 97 annual report explained:

> Among the Company's business objectives are increasing the subscriber base and continuing to accelerate the change in its business model *into one in which increasingly more revenues and profits are generated from sources other than online service subscription revenues, such as advertising and electronic commerce. The Company expects that the growth in other revenues, assuming such growth continues, will be the primary source of future profit growth, and will provide the Company with the opportunity and flexibility to fund the costs associated with flat-rate pricing as well as programs designed to grow the subscriber base and meet other business objectives. . . . Advertising revenues are expected to grow in*

- 7 -

*importance as the Company is able to leverage its large and growing subscriber base*.

9.    Thus, continuing subscriber growth *and* accelerating e-commerce advertising growth were the keys to AOL's continued profitable growth. And, according to AOL's public reports and statements, its subscriber base and online advertising grew during 97-99. For fiscal 97, AOL reported e-commerce advertising revenues of $147 million. For fiscal 98 this grew to $358 million. For fiscal 99, it reached $756 million. This was by far the fastest growing part of AOL's business – and it was reported to be very profitable. Also, AOL's e-commerce advertising backlog – the key indicator of the future growth of this key area of its business – was reported to be growing *even more rapidly than revenues*, from $180 million at 6/30/97 to $1.5 billion at 6/30/99. At the same time, AOL continued to report strong online access subscriber growth from 8.6 million at 6/30/97 to 12.5 million at 6/30/98 to 17.6 million at 6/30/99. The apparent synergy of successfully monetizing this rapidly growing subscriber base to generate rapidly growing, high-margin e-commerce advertising revenues apparently enabled AOL to report consistently growing revenues and profits and to forecast fabulously profitable growth for years to come.

10.    While AOL's subscriber base and e-commerce advertising business both appeared to be achieving tremendous growth, in fact, behind the scenes, things were far different – and much worse. After an initial burst of success and obtaining millions of dollars of multi-year advertising commitments (mostly from dot-com companies), by late 99, AOL's e-commerce advertising business was beginning to encounter problems due to several factors, including very poor consumer response to online advertising generally and extreme customer annoyance at "pop-up" ads, resulting in persistent complaints and much lower response rates than forecasted or necessary to justify the rates AOL needed to charge to maintain the high profit margins its e-commerce advertising was supposed to provide. And because much of AOL's e-commerce advertising came from newer start-up companies – mostly dot-coms that utilized the proceeds of initial public offerings or venture

- 8 -

capital financings to purchase such advertising – as the business plans of an increasing number of these companies faltered or failed, they were curtailing, defaulting on, canceling or threatening to cancel their e-commerce advertising commitments with AOL. And AOL's subscriber growth was not nearly as strong as represented either, both in the U.S. and internationally – and, in fact, AOL was inflating its subscriber numbers by several improper tactics, including counting non-paying free trial participants as paying subscribers and continuing to do so after their trial period had expired without them converting to paying status, and by giving paying subscribers that tried to cancel a free extension period for three to six months and continuing to count them as paying subscribers.

11.     This weakening of AOL's e-commerce advertising business, combined with the maturation and slowing growth of its core online access business, plus increasing competition in that market, was a potentially lethal combination as it indicated to AOL's sophisticated insiders that AOL's halcyon days as a premier growth company were seriously threatened and coming to an end. Thus, Case, Novack and Pittman decided that, while they still could, they would try to take advantage of the apparent success and fabulous growth prospects of AOL and use AOL's high priced stock to acquire a large company with real assets and proven earning power before the market learned of the difficulties afflicting AOL's business and crushed its stock price, making such an acquisition impossible, so that the real assets and proven earning power of the acquired company would cushion the coming downturn in AOL's business that they knew was likely inevitable and already beginning to occur.

12.     However, an acquisition of the type and size that Case and Pittman had in mind for AOL would take many months to negotiate and close. So, in order to continue to cover up the truth about the deterioration in the growth in AOL's core online access business and the emerging problems in its e-commerce advertising business, AOL's executives engaged in contrivances and falsifications to inflate AOL's subscriber metrics and inflate its e-commerce advertising revenues



and backlog. AOL did this by entering into an increasing number of bogus e-commerce advertising deals where the transactions lacked economic substance, and AOL was providing the funds to its purported customers to purchase the advertising – via "barter" or "swap" or "round trip" deals. These bogus transactions not only improperly inflated AOL's e-commerce ad revenues, but also grossly distorted AOL's e-commerce ad backlog, because these deals were, in many instances, one-time structured deals, not really entered into in the ordinary course of business or reflective of true ongoing demand for AOL's e-commerce ads. AOL also failed to reveal that virtually all of its e-commerce backlog *could be canceled at will by the customer* without cost or any significant penalty, that many of the backlog commitments were from companies that lacked the financial wherewithal to honor them, and that increasing numbers of its customers were canceling their ad commitments or threatening to cancel them unless AOL cut their rates to far less profitable levels. Yet AOL continued to include in its reported backlog hundreds of millions of dollars of deals it knew were very likely to be canceled or could not be honored. And, to make it appear that its Internet access subscriber base was not only continuing to grow, but that its growth was actually accelerating, AOL intensified its promotional giveaway activities to get millions of trial *non-paying* subscribers, but counted them as *actual paying subscribers*, even continuing to do so after their free trial period expired and they did not convert to paying status and should have been canceled. To further artificially boost subscriber numbers, customers who had been paying customers and then tried to cancel the service were given six months of free service and then included in the count of subscribers, or, if this was refused, simply not purged or removed from the active subscriber list.

13.    In the Fall of 99, Case, Novack and Pittman identified Time Warner as the kind of company they wanted AOL to buy – a huge, well-established company with valuable assets and real earning power. In 10/99, Case and Levin began discussions about AOL acquiring Time Warner. While Time Warner was a successful company with a stable of successful media and entertainment

businesses, its growth in recent years had slowed. Levin, Time Warner's Chairman, longed for the increased publicity and glamour that would be his as the CEO of a huge, rapidly growing media company successfully involved in the "Internet" – succeeding in the new digital age. Levin and Time Warner's other top insiders were anxious to find a way to boost Time Warner's growth, as this would enable them to preside over a larger, faster growing company and benefit them economically. And the executives from both AOL and Time Warner knew that any merger would trigger "change of control" provisions in their respective compensation plans, enriching them by hundreds of millions of dollars. As AOL continued to report record subscriber growth and record financial results, AOL's stock hit its all-time high of $94 per share on 12/13/99. After several weeks of discussions, Case would strike a final deal on 1/6/00 with Levin to buy Time Warner for AOL stock. It was agreed that AOL would acquire Time Warner in a stock-for-stock merger in which Time Warner shareholders would receive 1.5 shares of new AOLTW stock for each of their existing Time Warner shares, AOL shareholders would receive one share of new AOLTW stock for each of their AOL shares, and Case would be the Chairman of the new company, with Levin its CEO.

14.     The executives at both Time Warner and AOL and their respective firms' advisors and accountants all had huge personal motives to bring about the closing of the Merger. Due to "change of control" provisions in the executive compensation plans of both AOL and Time Warner, consummation of the Merger would convert all existing AOL and Time Warner stock options into new AOLTW stock options and trigger acceleration and immediate vesting of executive stock options and deferred compensation benefits that were worth hundreds of millions if not billions of dollars to the top executives. For instance, options to purchase 44 million shares of AOL stock (35 million of which were for the top five AOL executives) at $18.78 per share (with a market value of $48 per share) accelerated and vested, creating a $1.3 billion windfall benefit ($1 billion for the top five AOL executives alone). AOL's and Time Warner's financial advisors, the Salomon Smith

Barney division of CitiGroup Global Markets, Inc. and Morgan Stanley, were similarly motivated to get the Merger closed as they would split one of the largest investment banking fees of all time – over $135 million – immediately upon the closing of the Merger, regardless of how it worked out over time.  AOL's and Time Warner's accounting firm, Ernst & Young, hoped to retain both huge and lucrative accounts, becoming the accountants for AOLTW, one of the largest public corporations in the world.

15.    On 1/10/00, AOL and Time Warner announced that AOL would acquire Time Warner, subject to the approval of Time Warner shareholders at a meeting to be held in 6/00, with the Merger to close some months later after required regulatory approvals were obtained.  In announcing the Merger, Case and Levin said AOLTW was a "*tremendous company*" that "*can be the most valuable and the most respected company in the world*," and which had "*an extraordinary combined management team*."  After the AOL/Time Warner Merger was announced in 1/00, it was very important to executives at both companies, as well as their financial advisors involved in the Merger, to make it appear that AOL's and Time Warner's businesses were both continuing to succeed individually and would achieve the forecasted accelerated profitable growth when combined so that their companies' stock prices would continue to trade at high levels, the shareholders of Time Warner would approve the Merger, and the executives could reap the billions of dollars of benefits coming to them immediately upon the closing of the Merger, regardless of how it later turned out.  Thus, with the help and assistance of their financial advisors, Salomon Smith Barney and Morgan Stanley, AOL and Time Warner commenced a campaign of extremely bullish forecasts of growth for the new enterprise – *telling investors AOLTW would achieve over $40 billion in 01 revenue, at least 30% EBITDA growth in 01 (a $1 billion EBITDA increase in the first year after the Merger) and 25% EBITDA growth per year going forward, with 50% free cash flow growth in 01 and in future years.*

- 12 -

16.     To support the prices of AOL and Time Warner stocks and to induce the shareholders of Time Warner to approve the sale of their company to AOL, after the Merger was announced in 1/00, the top officers of AOL and Time Warner and their financial advisors repeatedly extolled the success and strength of AOL's business and how its growing subscriber base and e-commerce advertising revenues would be the engine of growth, *i.e.*, the "*crown jewel*" of the new company – AOLTW – which would achieve huge synergies and economies resulting in large revenue, EBITDA and free cash flow growth *immediately following the Merger and for years thereafter*.  In the months after the Merger was announced, AOL's reported subscriber metrics and advertising and e-commerce advertising revenue and backlog continued to soar.  This was critical as, in light of defendants' representations regarding the importance of e-commerce advertising revenue to AOL's and AOLTW's "future profit growth" (advertising revenue would generate 20%+ of AOLTW's total revenues post-merger and was to be its fastest growing business) and in the midst of the Internet frenzy, when investors were at their most skittish and stock prices at their most volatile, *any indication that AOL's e-commerce advertising revenue growth was not sustainable, that its reported e-commerce advertising revenues on backlog had been or were being overstated, or that its e-commerce advertising backlog or online subscriber growth were no longer growing as rapidly as in the past would have had a devastating impact on the price of AOL's stock and the prospects of a merger with Time Warner.*[1]

17.     In order to accomplish the Merger, the Boards of Directors of AOL and Time Warner, with the help of their financial advisors, created, signed and filed with the SEC a registration statement providing for the issuance of the new stock of the merged enterprise – the "Merger

---

[1]     For example, the share price of Yahoo! Inc., a key AOL competitor, fell by 21% after the company reported strong advertising growth but acknowledged that its rate of growth could not be sustained.

- 13 -

Registration Statement." AOLTW used the Merger Registration Statement not only to issue the new shares of its stock, but also as part of obtaining Time Warner's shareholders' approval of the transaction. The Merger Registration Statement contained AOL's subscriber metrics and financial results, reporting dramatic increases in AOL's e-commerce advertising revenues (and backlog) and online access subscriber numbers. The Merger Registration Statement also contained the unqualified certification of AOL's 98 and 99 financial statements by its auditor, Ernst & Young.

18.    The financial and business metrics deceptions detailed above pervaded the Merger Registration Statement, which contained AOL's 98-99 annual financial statements and AOL's interim financial results through 3/31/00. The graph below shows the strong growth in AOL's subscriber and e-commerce revenues and backlog as presented to Time Warner's shareholders in the Merger Registration Statement:



19.    The Merger Registration Statement urged Time Warner's shareholders to vote in favor of the sale of their company to AOL because, among other things, the Merger was "*fair*" to Time Warner shareholders. The Merger Registration Statement said the transaction would create

"revenue opportunities and synergies in areas such as advertising by providing companies 'one-stop' shopping for their online as well as print and broadcast media advertising." It also stated that total *EBITDA synergies would be approximately $1 billion in the first full year of operations, producing an EBITDA growth rate of approximately 30% in that first year.* In other communications, the Time Warner and AOL insiders and their financial advisors stated that the combined company "*will be a high growth vehicle*" with a "*long-term EBITDA growth rate of 30% plus*" and could or would create the "*most valuable*" company in the world.

20. After the Merger was first announced in late 1/00, AOL continued to report record results – reporting for the quarter ending 12/31/99 a record number of new subscribers (1.8 million for a total of 20.5 million) with soaring and better-than-expected e-commerce revenues, *double those in the prior year* – and that its e-commerce *backlog had now reached a record $2.4 billion*. AOL executives affirmed that AOLTW would have a 30% EBITDA growth rate, that "*everything really is on track*," online advertising was "*going great for us*" and subscriber growth was "*going quite well.*" In early 2/00, Levin met with analysts and investors and said "*the new company's unique combination of strengths*" would lead to 30% EBITDA growth in 01 – *a billion dollar first year gain* – and that AOLTW would have such a strong financial condition that AOLTW would have "*no financial constraints*" on its growth.

21. In 4/00, as the sale of Time Warner to AOL was pending before Time Warner shareholders for their approval, AOL *again reported record results* – 1.7 million new subscribers (22.2 million total), *another 100% jump in e-commerce advertising revenue* and a still growing e-commerce advertising backlog (*now $2.7 billion*). Investors were assured these results showed "*the tremendous strength of [AOL's] operations*," that "*we continue to see strong, underlying fundamentals in each of our operations*," that AOL was "*on a clear path to continued growth and increased profitability*" and that while AOL had taken online advertising "*to new heights, we've*

- 15 -

*barely scratched the surface.*" AOL assured investors its e-commerce backlog counted only "*firm contractual backlog that is almost guaranteed revenue,*" that the backlog was constantly reviewed and "*trim[med]*" on a quarterly basis and that AOL had no "*significant risks in the backlog.*" Case also assured investors that AOL results showed that "*increasing competition with ... free services, contrary to many dire predictions, certainly is not affecting us ... especially when you see the 2 million members that we added worldwide during the quarter.... We've never been more bullish on the prospects for our combined company than we are today.*" In 4/00, Levin affirmed that AOLTW would achieve 01 free cash flow of $5 billion and that free cash flow would "*grow[] at 50 percent a year,*" yielding a "*very powerful balance sheet.*" Salomon Smith Barney issued an extremely bullish report on AOL, stressing that its e-commerce advertising growth had "*several sustainable and predictable sources,*" raising AOL's revenue and EPS forecasts, and stating that the new company, AOLTW, would be a "*free cash flow machine*" worth $115 per share. Morgan Stanley also pitched in with a report stating that "*we really like the merger,*" which was "*very, very impressive*" and "*makes sense strategically and financially.*" According to Morgan Stanley, "*few companies have the compelling financial and valuation characteristics of the combined [AOLTW],*" stressing its most unique asset – AOL's "*26 million[2] paying subscribers.*" For AOLTW, Morgan Stanley forecast 28%-29% EBITDA growth in 01, "*conservatively*" 25% EBITDA growth in 00-05, and that e-commerce advertising revenues would grow at 20%-22% per year in 00-05 with 80% gross profit margins. The Merger Registration Statement became effective on 5/19/00 and included representations that AOL had just achieved record e-commerce advertising revenues, a 103% year-over-year increase, that AOL had 22.2 million members (subscribers) and an e-commerce advertising backlog of $2.7 billion, as of 3/31/00.

---

[2]     Including the CompuServe service.

22.    As a result of the contents of the Merger Registration Statement, the reported success of AOL's core business and its e-commerce advertising operations, Ernst & Young's certification and/or review and approval of AOL's financial results, Morgan Stanley's fairness opinion and the forecasts of merger synergies and economies and the revenue, EBITDA and free cash flow growth to be achieved by AOLTW, on 6/23/00, Time Warner shareholders approved AOL's acquisition of Time Warner. However, even as the Merger Registration Statement was being circulated to Time Warner shareholders and they were voting to sell their company to AOL, behind the scenes, AOL and Time Warner top executives knew things were far different than what was being publicly represented or forecast. They knew or should have known that the success of AOL's e-commerce advertising operations and backlog, as reported, were inflated by bogus one-time highly structured barter/swap/round trip and equity investment deals to create otherwise unavailable and unsustainable revenues. In addition, the problems in AOLTW's core online subscription business had worsened due to market saturation and intensified low-price or no-cost access competition, requiring AOLTW to continue to engage in improper tactics to boost its subscriber numbers in an effort to conceal the deterioration of that core part of its business.

23.    Due to the regulated nature of Time Warner's and AOL's businesses, before the Merger could be closed, it was necessary to secure several regulatory approvals, a process that delayed the closing of the Merger for several months – as it turned out, until 1/01. During the period following Time Warner stockholder approval of the Merger in 6/00 and the closing of the Merger in 1/01 upon receipt of the required regulatory approvals, it was more important than ever for defendants to continue to present AOL's core online access business and its e-commerce advertising as achieving rapid growth and success. This was necessary not only to support AOL's stock price, but also because the Merger documents contained provisions that *required* Time Warner's Board to terminate the Merger in the event of any "*material adverse change*" in AOL's business or finances

- 17 -

and *permitted* Time Warner's Board to terminate the Merger for any reason upon a payment to AOL. Any revelation of business problems, slowing growth or financial falsification at AOL or indication that AOL's or AOLTW's growth forecasts were impaired would have crushed AOL's stock and resulted in tremendous pressure on Time Warner's Board and executives to terminate the Merger (and on Morgan Stanley to revise or revoke its fairness opinion) – something they did not want to do, since they all stood to gain hundreds of millions of dollars when the Merger closed, regardless of how it turned out later.

24.    During the months preceding the closing of the Merger, AOL's senior executives were frequently secretly briefed on the decline in advertising revenue, and held weekly meetings to discuss the increasingly devastating effect on AOL of the troubles suffered by the company's dot-com customer base. Rather than disclose this adverse trend and risk derailing the Merger, AOL concealed it. The company did not take non-paying dot-coms to court to collect for fear that public filings would disclose this growing weakness in AOL's business. Instead, it charged failing dot-com customers a fee for shortening the term of their contracts and improperly recorded the fee as advertising revenue. Additionally, AOL's Business Affairs unit structured increasing numbers of "unconventional" deals, *i.e.*, "*BA Specials*" – transactions used to inflate reported e-commerce advertising revenues and backlog. For example, AOL improperly converted outstanding uncollected legal judgments and settlements into advertising revenues and even reported millions of dollars of revenue on advertisements it had run without the potential customers' consent. Other "unconventional" transactions were "swaps" or "round trips," akin to those employed by Global Crossing and Enron Corp., in which AOL and other companies agreed to advertise with each other – swap deals with no real economic substance. AOL did bogus deals with both Qwest and WorldCom – two companies whose own accounting has been shown to be grossly falsified – and Veritas, which has restated its results to eliminate millions in revenues from bogus deals with AOL, and

Homestore.com, which has not only restated its financial results due to phony deals with AOL, but has seen several of its top executives plead guilty to criminal charges for phony deals – *including deals with AOL* – which resulted in AOLTW being added as a defendant in the large securities class action suit on behalf of Homestore.com's shareholders alleging that AOLTW participated in a scheme to help inflate Homestore.com's (and its own) financial results via a host of phony e-commerce advertising deals. The federal district court judge presiding over the *Homestore.com* case said that AOL's behavior was part of a "*massive conspiracy driven by pure avarice.*" An AOL deal with Bertelsmann AG was derived from AOL paying an extra $400 million to Bertelsmann for its stake in AOL Europe and Bertelsmann "buying" $400 million in advertising from AOL.

25.    Thus, following stockholder approval of the Merger in 6/00, the top executives at AOL and Time Warner continued to falsely reiterate their previous forecasts of synergies and economies the Merger would create, as well as the forecasts of huge revenue, EBITDA and cash flow growth immediately following the Merger and for years to come. During 00, AOL continued to report its financial and operating results as a separate entity, and continued to report strong growth in its online access subscriber metrics, both domestically and internationally, as well as continued strong growth in the revenues of its high-margin e-commerce advertising business and an ever-growing backlog of e-commerce advertising commitments. AOL and Time Warner continued to report these results and their executives continued to make these extraordinarily bullish forecasts of synergies and economies and future revenue and profit growth, even though during this period the dot-com boom imploded and the U.S. economy weakened, causing many honest companies to report curtailed advertising commitments and/or reduced advertising revenues or growth – leading to fears in the investment community that these same conditions would hurt AOL and Time Warner and thus AOLTW's business post-merger.

- 19 -

26.    However, AOL and Time Warner executives went to great lengths to negate any notion that the e-commerce advertising business of AOL or the cable TV advertising business of Time Warner was suffering any slowdown or that the economies, synergies and growth they were forecasting for AOLTW would not be achieved. In mid-7/00, both Time Warner and AOL issued their financial results. AOL again reported record results – 5.6 million new subscribers in F00 (a total of 23+ million) – driven by e-commerce advertising revenue which soared 160% to $609 million – with a backlog now of $3 billion. AOL said its record results "*reflect our success in executing business plans*," "*underscoring [the] strength and sustainability of our business model*." AOL was "*continuing to drive up [its] advertising and e-commerce revenues through an increasing number of partnerships*," building "*backlog at a record pace*." AOL's business "*has never been stronger, our growth opportunities have never been better*." AOL stressed the quality of its e-commerce advertising backlog – "*more of the traditional blue chip names*" which "*account for the vast majority of our backlog*." AOL assured investors that "*we actively monitor and manage the backlog and continue to have a very high confidence level in it . . . all the more so, as the trends of consolidation among the dot-coms [and] the adoption of the medium by established advertisers continues to accelerate*." Finally, AOL told investors, "*[a]ll of this serves to underscore the strength of the foundation on which [AOLTW] will be built*." In mid-7/00, Time Warner also reported its results for the quarter ended 6/30/00, stating that the new AOLTW management team was "*already working very well together*" and that based on recent meetings, Levin was even "*more comfortable*" with the numbers, stating that the new company would show "*strong sustainable growth*" with 01 revenues "*north of $40 billion*," with annual revenue growth of "*12-15%*" thereafter, 01 EBITDA "*north of $11 billion*" with annual EBITDA growth of "*about 25%*" thereafter, and free cash flow growth of "*50% a year*." All of this would "comfortably" yield EPS growth of 25%-30% annually.

27.     In fact, by at least 8/00, internal company documents showed that AOL was at risk to lose substantial advertising revenue from existing customers the following fiscal year. According to a subsequent 7/02 *Washington Post* article, in 9/00, AOL documents had estimated that AOL was at risk to lose $108 million in advertising revenue in F01 (7/1/00-6/30/01) due to the financial difficulties of its advertising customers.   In early 10/00, defendant Pittman and other AOL executives were told that as a result of the Company's many failing dot-com customers, AOL was at risk to lose $140 million in advertising revenue in calendar year 01.

28.     As 00 unfolded and AOL and Time Warner continued to work on closing their Merger, the dot-com implosion accelerated and many analysts continued to fear a general slowdown in advertising spending – a combination of events some thought would hurt AOL's e-commerce advertising and Time Warner's cable TV business and AOLTW's growth and success after the Merger closed.  For instance, on 10/16-17/00, AOL's and Time Warner's stocks plummeted from $53.54 to $48 and from $80 to $65.40, respectively, on these concerns.  But AOL and Time Warner executives quickly put these concerns to rest.

29.     On 10/18/00, AOL and Time Warner again both reported very strong financial results – *in AOL's case including an 80% increase in e-commerce advertising revenues and a $3 billion e-commerce advertising backlog*!  AOL and Time Warner executives, in conference calls and media interviews, went to extraordinary lengths to calm investor concerns, assuring investors that "*AOL's advertising growth is right on target*," and that "*the current advertising environment benefits us because it will drive a flight to quality*."  As to any supposed industry-wide slowdown in advertising revenues, Pittman, AOL's President, and Levin, Time Warner's CEO, both said "*I don't see it and I don't buy it*," and Pittman stressed AOL's e-commerce revenue growth was "*very healthy . . . I can't say that strongly enough*."  Case attributed AOL's resilience to the fundamental strength of its business and reassured investors that the collapse of the Internet boom would not affect AOL.  Case

said: "*We have looked at our vulnerability to the dot-com sector, and only a few percentage points are potentially at risk.*" Levin assured investors that the integration of the two companies was "*actually going . . . better than anything I've ever experienced*" and he was "*even more confident today . . . about our ability to meet our financial targets.*" Case said "*our post-merger planning for integrating AOL and Time Warner is going exceedingly well,*" "*we feel terrific about the way the new company is coming together and we are convinced that we'll meet the financial targets we have set.*" Kelly said, "*[o]ur backlog of committed advertising and commerce revenues was more than $3 billion . . . we are extremely confident about the quality and composition of our backlog,*" "*[w]e review our backlog carefully . . . it's in very good shape . . . [and] AOL's advertising commerce business is very healthy . . . . I can't say that strongly enough.*" Again, they told investors that in 01 AOLTW's "*revenues will be $40 billion plus,*" "*revenue growth would be 12% to 15% annually, EBITDA . . . will be $11 billion plus*" and free cash flow would be "*growing at 50% a year.*" As a result, investors were told that the AOL/Time Warner Merger would "*substantially driv[e] our growth [and] profitability,*" and that "*[w]e are confident that AOL Time Warner will be able to deliver quickly on the promise of the merger.*" These extraordinary assurances, representations and forecasts halted the sharp decline in AOL's and Time Warner's stocks. By early 11/00, AOL's stock recovered and was up to $58.50 per share. Time Warner's stock had recovered to $87 per share. The Merger, and the insiders and their financial advisor's hopes to cash in, remained on track.

      30.     Between late 99 and early 01, the period corresponding to the time between the start of merger discussions and the close of the Merger, "unconventional," *i.e.*, bogus, transactions accounted for several hundreds of millions of dollars of AOL's reported e-commerce advertising revenue and ad backlog. *Without these unconventional deals, AOL would have fallen far short of analysts' estimates of its growth in advertising revenue in 00 and 01,* and the growth of its backlog

- 22 -

would have slowed sharply if not actually declined. The "unconventional" (*i.e.*, bogus) deals thus enabled AOL to delay the time when the adverse impact of the collapse of dot-com advertising on its business would be apparent. Worse yet, in order to cover up and conceal the deterioration in AOLTW's own cable network advertising business – one of the true mainstays of the Time Warner empire – which was being badly hit by intensifying competition and a slowdown in advertising, the AOLTW executives were engaging in a number of tricks to artificially and improperly boost AOLTW's cable TV advertising revenues, including counting as advertising revenues initial new channel licensing fees which, in fact, were not advertising revenues at all. The hundreds of millions in fabricated advertising revenues and e-commerce advertising backlog was critical in allowing AOL and Time Warner to beat Wall Street analysts' expectations for earnings during a time when the advertising business overall seemed to be suffering a slowdown, but one not impacting AOL or Time Warner overall, making seem credible AOLTW's reported assurances that the dot-com implosion and advertising slowdown was not only not hurting them, but was actually benefiting them, as the current conditions drove a "flight to quality."

31.     When the AOL/Time Warner Merger closed in 1/01, AOLTW reaffirmed the previous forecasts of Merger synergies and economies, as well as the growth in revenues, EBITDA and cash flow to be achieved by the new enterprise, telling investors a top flight "*exceptional*" management team *had already made substantial progress in successfully integrating the operations of the two companies*. The stock of the new company initially traded at $49 per share. And, as the new company came into existence, its Board announced a $5 billion common stock repurchase program, whereby AOLTW would repurchase hundreds of millions of shares of its stock on the open market,  because, in the opinion of AOLTW's management, *that stock was "undervalued*." At the end of 1/01, a few weeks after the Merger closed, AOLTW held one of the largest investor meetings in the history of any public company in New York City. During their

discussions with analysts in connection with that meeting, the top executives of AOLTW, *i.e.*, Levin, Case, Pittman and Parsons, again forecast AOLTW 01 revenues of $40 billion and 01 EBITDA profit growth of 30% – a giant 01 $1 billion increase – as well as 50% free cash flow growth in 01 and future years.  They extolled AOLTW as a "*one-of-a-kind company positioned for sustainable high growth*," and stressed that strong growth in AOL's online subscriber numbers and its e-commerce advertising revenues would be a major driver of growth for AOLTW going forward. AOLTW's important cable TV operations, especially its advertising, was also represented to be achieving record results.  Time Warner's financial advisor – Morgan Stanley – repeated all these glowing assurances and forecasts.  However, at this time AOLTW *stopped AOL's prior practice of reporting its e-commerce advertising backlog*!  When asked why AOLTW had done this, Kelly, AOLTW's CFO, told analysts that the e-commerce advertising backlog figure was *no longer "meaningful"* due to the increased size of the new company and its diverse advertising revenue streams.  In truth, AOL's previously claimed e-commerce advertising backlog was bogus, inflated by hundreds of millions of dollars of bad, one-time, not-to-be-repeated and cancelable-at-will deals – and even despite these falsifications was now falling sharply and thus had to be concealed from investors to perpetuate the false illusion that the Merger was a success.

32.    Upon the closing of the Merger, Morgan Stanley and Salomon Smith Barney immediately pocketed cash fees of over $100 million – the largest merger advisory fees in history. Realizing that their representations and forecasts were at best reckless, if not deliberately false, due to the host of intensifying negative factors that were hurting AOLTW's business and would inevitably crush its stock when they ultimately could no longer be concealed, as soon as the Merger closed, AOLTW's top executives took steps to protect themselves financially from the impending collapse of AOLTW stock.  Because the Merger had now closed, *all of their previously unvested AOL and Time Warner stock options had converted to AOLTW stock options and immediately*

*accelerated and vested*. Thus, they were now in a position to bail out of AOLTW. And bail out they did.   Beginning only days after the Merger closed – and **the very day after the huge and extraordinarily** bullish analysts' conference in New York at which they assured investors of the success of the Merger and forecast years of strong financial growth for AOLTW – AOLTW top executives began to spend over one billion dollars of AOLTW's corporate funds to repurchase millions and millions of shares of AOLTW's "**undervalued**" stock on the open market – to manipulate upward and artificially inflate the stock – while at the **same** time, these **same** executives began to unload millions of shares of their own AOLTW stock at what they knew were artificially inflated prices, to benefit from that stock price inflation and shield themselves from the economic calamity and the stock collapse they knew was coming.  Starting the very next day, and continuing **between 2/2/01 and 6/14/01, while these AOLTW top insiders caused AOLTW to spend $1.3 billion in AOLTW's corporate funds to repurchase some 30.2 million shares of AOLTW stock on the open market, these same AOLTW insiders unloaded 8.9 million shares of their own AOLTW stock for some $440 million in insider trading proceeds**!

33.     During late 4/01 and early 5/01, the large stock selling by AOLTW insiders began to attract notice in the investment community due to required SEC filings disclosing these sales.  When analysts and members of the media questioned those sales as inconsistent with the AOLTW buy-back of its "**undervalued stock**," AOLTW spokespersons Jim Whitney and Ed Adler lied, telling them that the sales were prompted by a "**change in AOL's compensation structure**," a need to raise money for executives' "**charitable giving**" and "**philanthropic activities**," and were "**part of their long-term personal financial planning**," as the buy-back program "**has nothing to do with the individual selling by executives**."   In fact, the buy-back program was designed and intended to support the stock sales by the executives which were a bail-out by them to pocket hundreds of

millions of dollars before the truth about the failure of the Merger and problems with AOLTW became public and the stock collapsed.

34.    Following the Merger, continuing concerns over the impact of the dot-com collapse and an advertising slowdown in AOLTW's business persisted, hurting AOLTW's stock, driving it down to as low as $33 in early 4/01, just as the massive AOLTW insider bail-out was underway.  In 4/01, AOLTW was to report its 1stQ 01 results – *its critical first quarter as a newly merged enterprise* – which would be intensely focused on by analysts and investors for any sign that AOLTW's business was faltering, due to the advertising slowdown or otherwise.  When the reported results *beat expectations*, AOLTW assured investors that this showed that the Merger integration had succeeded and the promised synergies and economies were being achieved – reporting *strong subscriber growth, e-commerce and cable TV advertising revenues and EBITDA*.  AOLTW's executives told investors that these *results "underscore the unique promise of AOL Time Warner,"* that *"this is just the beginning"* and that the *"businesses are working together as one, unified organization to deliver shareholder value over the near- and long-term."*[3]  As a result of these

---

[3]    The statements that AOLTW would have or had an excellent or outstanding management team that was working together effectively to integrate AOL's and Time Warner's separate operations to achieve the proposed Merger synergies and economies were false.  The executives for the two companies hated each other, were constantly fighting with each other and attempting to aggrandize their own positions in the combined Company.  As *The New York Times* reported on 1/19/03:

> But all the happy talk about a new common ground leaves a bitter taste among those who are no longer part of the effort.
>
> "They hated us and did everything they could to make sure that we got no cooperation and made no progress, including Logan," said a former senior AOL executive.  "It reminds me of the child who killed his mother and father and then threw himself on the mercy of the court as an orphan."

- 26 -

assurances and forecasts, AOLTW stock strengthened, soaring from $43 on 4/17 to $50 on 4/18.

The stock continued to move higher during 5/01, within weeks reaching its post-merger high of

$58.51 as the AOLTW insiders continued their bail-out, assisted by the expenditure of hundreds of

millions of dollars of AOLTW's cash to buy back AOLTW shares on the open market while they

were selling their own AOLTW shares.

    35.    On 5/17/01, Levin spoke at the AOLTW Annual Meeting of Shareholders, stating:

> Last year, on this same stage, I said our intention was to come out fast from the starting gate as a single entity focused on executing one strategy. ***Although the regulatory process delayed our start, there was a silver lining. During that time, our board and management became thoroughly acquainted. The degree of cooperation and consultation was extraordinary*** . . . .
>
> Under CFO Mike Kelly, we formed a high-powered financial group that has done a remarkable job of designing a set of metrics for a company in a category all its own. . . . ***As a result, we're comfortable with our 2001 year-end targets of***

---

Even Morgan Stanley has admitted after the fact (in 12/02):

> In our view, the biggest disappointment[] post the combination of AOL and Time Warner [is] . . . the inability of the AOL and Time Warner divisions to work together. On the last point, we believe the company suffered from the antithesis of a post-merger honeymoon – the management team seemed too focused on revenue and EBITDA targets at the expense of running the business and, simply, the people refused to work together. Something had to break, and break it did.

*The Daily Deal* reported (12/21/02):

> Steve Case thought he was buying Time Warner and one day he woke up to find the Warner guys in charge . . . . Now, however, the Warner guys face an extremely old, very daunting problem that is largely of their own making . . . ***AOL Time Warner consists of a number of . . . companies that don't talk to each other, don't like each other and treat each other as competitors***.

On 7/7/02, *The New York Times* reported:

> Morale among executives of the former Time Warner has plummeted steadily since the merger was announced at the start of 2000. Many had chafed at what they considered the initially condescending attitude among executives of the former America Online toward the stodgy world of old media, and they especially resented the cost cuts imposed to make the combined company's aggressive earnings goals.

*revenues of $40 billion and EBITDA of $11 billion. They're grounded in the operating strengths of AOL time Warner and its demonstrated potential.*

*Key to our performance is AOL. . . . I've described AOL as our crown jewel. . . . AOL is a transforming catalyst that immeasurably strengthens all our businesses.*

\*      \*      \*

*AOL's 2000 performance was truly outstanding. Subscriptions grew by 30%, from 20.5 to 26.7 million. Internationally, AOL added 2 million subscribers and the possibilities for accelerating this growth are dramatic.*

*In the first quarter of 2001 – our first as a combined company – the momentum stayed strong.*

36.     Then, in mid-6/01 – *just days after top AOLTW executives* had unloaded over 8.9 million shares of their AOLTW stock at inflated prices and pocketed $440 million for themselves – it leaked out that AOLTW had suspended Eric Keller and another top AOL executive who had both been e-commerce deal negotiators in AOL's Business Affairs unit, leading to speculation in the financial media, which AOLTW denied, of financial improprieties in AOL's e-commerce business. As those initial concerns over the reliability of AOL's e-commerce advertising figures grew and additional revelations came forth, AOLTW stock, which traded as high as $55 per share in mid-6/01, began a descent from which it would not recover. However, AOLTW executives denied any accounting improprieties, while providing false assurances to investors regarding the success of the Merger, the continuing success of AOLTW's core Internet access business, its e-commerce advertising business and the success of AOLTW's cable TV advertising business, insisting that AOLTW's forecasts of 12%-15% revenue growth, 30% EBITDA growth and 50% free cash flow growth were still accurate and were being achieved – thus causing the stock to continue to trade at artificially inflated, albeit lower, levels for many more months. For instance, in late 6/01, Levin assured investors that *"advertising revenues are . . . stabilizing,"* *"[w]e have several high-growth areas and we expect to grow at a healthy pace,"* and that AOLTW was *"on track"* to meet its 01

- 28 -

forecasts. Internally, lower level executives at AOLTW reacted with stunned disbelief to what they knew were false assurances.

37.    In mid-7/01, AOLTW reported its 2ndQ 01 results – its second quarter as a combined company. Again, AOLTW was extremely bullish. Again, the highly focused-on results were outstanding, with record AOL online subscriber numbers both domestically and internationally (30 million subscribers), and very strong AOL e-commerce advertising and Time Warner cable advertising revenue growth. The executives told investors that these "*record results*" were further proof that "*we are delivering on the promise of the AOL Time Warner Merger [and] . . . we have just begun to tap the enormous potential.*" They stressed AOLTW's "*outstanding bottom-line results [and] dramatic improvement in profit margins*" – "*proof that we are delivering on the promise of the merger.*" They also stressed the "*great progress [in] integrating the Company*" and that they "*have made and are making great strides in driving efficiencies . . . and expanding our EBITDA margins.*" Levin said AOLTW was now a "*premier growth company, a safe and secure place for people to put their money.*"

38.    In late 8/01, AOLTW stated that its prior forecast of $40 billion in 01 revenue was now "*at the top of the range*" for 01. But then, in late 9/01, AOLTW began to dramatically cut back its previous forecasts of post-merger revenue, EBITDA and cash flow growth, disingenuously blaming it on the events of 9/11/01. AOLTW stock plunged lower, falling to $30 per share by late 9/01. While AOLTW stock would continue to trade at artificially inflated prices due to defendants' continued false assurances and promises regarding AOLTW's business and continued reporting of false financial results, after 9/01 there unfolded a shocking course of events exposing the AOLTW deal as one of the worst corporate mergers of all time, where executives had "cooked" corporate books and misled investors and, with help from their Wall Street bankers, had inflated AOLTW's



stock so that they could pocket over a billion dollars for themselves while AOLTW shareholders were decimated.

39.    In 11/01, Kelly, AOLTW's CFO (and the prior CFO of AOL), was ***relieved of his accounting responsibilities***.  Levin pretended this was a promotion for Kelly ("***a super CFO***") when, in fact, Kelly was demoted for participating in the gross falsification of AOL's financial reports prior to the Merger.  Then, in early 12/01, Levin – AOLTW's CEO – just 61 years old and who had promised never to retire, suddenly retired, stating he wanted "***more 'poetry' in his life***," a move that "***stunned***" investors and that the media termed a "***shocker***."  AOLTW stock declined from $36 to $31 over the next few days.  In 1/02, just after Levin left, AOLTW again slashed its revenue, EBITDA and cash flow forecasts, this time for ***both*** 01 and 02, now projecting single digit revenue growth in 02 with advertising revenue to show no growth.

40.    In early 4/02, Barry Schuler was ousted as the head of AOLTW's AOL unit.  In 4/02 or early 5/02, AOLTW's top insiders learned that as a result of the Keller suspension and Schuler ouster, press speculation over the legitimacy of AOL's e-commerce deals, AOLTW's CFO's demotion and Levin's sudden, startling departure, certain members of the financial press were now intensely investigating the Company – especially the activities of AOL's e-commerce advertising business.  Knowing that this would ultimately lead to the exposure of AOL's prior phony accounting practices and crush AOLTW's stock even further, in mid-02, several AOLTW top insiders unloaded even more of their AOLTW shares, selling off another 11.2 million shares for $205.2 million between 5/10/02 and 7/15/02, continuing to sell as they learned that *The Washington Post* was preparing to publish a major exposé on AOL's e-commerce advertising accounting practices, which would expose widespread irregularities and Pittman's role in them.

41.    On 7/18/02, just three days after this insider bailout by AOLTW executives, *The Washington Post* published an extensive investigative exposé laying out Pittman's role in falsifying AOL's financial reports. *The Washington Post* exposé reported:

> In October 2000, a critical question confronted America Online Inc. as it sought to cinch the largest merger in U.S. history: Was it feeling the effects of an industry-wide slowdown in advertising?
>
> *AOL's president at the time, Robert W. Pittman, offered a resounding answer: "I don't see it, and I don't buy it," he told Wall Street stock analysts and the media.*
>
> Other AOL officials were less optimistic. . . . *[I]nternal company projections raised caution about one sector: dot-coms. Failures were accelerating among those Internet start-ups, which represented a significant amount of the company's ad business.*
>
> About two weeks before Pittman's declaration on Oct. 18, he and other executives were told in a meeting at Dulles headquarters that AOL faced the risk of losing more than $140 million in ad revenue the following year.
>
> . . . [T]he internal warning came when investors were highly alert to any weakness in online advertising. Just a week before Pittman's public statements, for example, shares of AOL's key competitor, Yahoo! Inc., plunged 21 percent after the company reported strong ad growth but acknowledged that the pace could not be sustained. . . .
>
> In such an atmosphere, and with its takeover of Time Warner Inc. imminent, AOL sought to maintain its breakneck growth in advertising and commerce revenue. . . . AOL boosted revenue through a series of unconventional deals from 2000 to 2002, before and after the merger, according to a *Washington Post* review of hundreds of pages of confidential AOL documents and interviews with current and former company officials and their business partners.
>
> AOL converted legal disputes into ad deals. It negotiated a shift in revenue from one division to another, bolstering its online business. It sold ads on behalf of online auction giant eBay Inc., booking the sale of eBay's ads as AOL's own revenue. AOL bartered ads for computer equipment in a deal with Sun Microsystems Inc. AOL counted stock rights as ad and commerce revenue in a deal with a Las Vegas firm called PurchasePro.com Inc.
>
> AOL also found ways to turn the dot-com collapse to its advantage, renegotiating long-term ad contracts it risked losing into short-term gains that boosted its quarterly revenue.

*        *        *

- 31 -

Without the unconventional deals, AOL would have fallen short of analysts' estimates of the company's growth in ad revenue (which is reported in a category that also includes revenue from commerce) in three quarters in 2000 and 2001.

Collectively, the deals helped AOL beat Wall Street analysts' expectations for earnings per share – a critical profit yardstick for investors – by a penny per share in two quarters in 2000. At the time, investors punished companies whose earnings were off by even a cent.

Alec Klein, *Unconventional Transactions Boosted Sales; Amid Big Merger, Company Resisted Dot-Com Collapse*, Wash. Post, 7/18/02, at A01. The next day – 7/19/02 – former AOL President and now AOLTW Co-COO Pittman was kicked out of the Company.[4]

42. The collapse of AOLTW's e-commerce ad revenues are shown below in a chart demonstrating AOL's advertising and e-commerce revenues after restatement to eliminate the bogus transactions AOLTW has admitted:



_____

[4] According to *The Daily Deal* (12/21/02):

Is AOL's advertising in the tank? Well, a lot of its advertising, hype to the contrary, **was always in the tank. Much of it was a barter business, not a cash business, and trying to stay afloat in an angry sea by selling advertising was a mug's game** .... AOL, like a lot of '90s stuff, was always something of a Potemkin village, and now it has no bubble to hide behind. This is the true story of what went on, and it is the true story of today.

43.     In late 7/02 and early 8/02, AOLTW confirmed it was the subject of SEC/DOJ civil and criminal investigations regarding its e-commerce advertising deals, including those with WorldCom, Sun Microsystems, Qwest, Oxygen Media, PurchasePro, DirectTV and Homestore.com, as well as AOLTW's forecasts of strong financial growth before and after the Merger, while insiders were bailing out, unloading hundreds of millions of dollars worth of their AOL and AOLTW shares at inflated prices. On 7/25/02, AOLTW stock hit its post-merger low of just $8.60 per share. "*This is the end of a fiasco*," said one analyst. On 8/9/02, AOLTW publicly admitted for the first time that AOL had previously improperly recorded millions of dollars of e-commerce advertising revenues. And a few days later, on 8/14/02, it was revealed that David Colburn, the senior AOL executive in charge of e-commerce advertising had also been kicked out of the Company. On 9/18/02, AOLTW was named a defendant in the *Homestore.com* securities class action suit based on very detailed allegations that it had participated in a scheme to inflate Homestore.com's, and its own, advertising revenues via millions of dollars of specified phony transactions. Several Homestore.com executives have now pleaded guilty to criminal securities fraud charges arising from these transactions with AOLTW. AOLTW then restated several prior quarters of its financial results to eliminate almost $200 million in improperly recognized e-commerce advertising revenue – much of which was recognized and reported prior to the Merger. AOLTW then admitted to improperly accelerating the recognition of hundreds of millions of dollars of cable TV payments as advertising revenues and also made accounting changes and adjustments, reducing its previously reported advertising revenues by many millions of dollars more. Finally, after repeatedly denying it would do so (*i.e.*, on 8/23/02, AOLTW's CFO said "it's absolutely premature and inappropriate to do an impairment charge at this time"), in early 03, AOLTW took a gigantic goodwill write-off ($45 billion) related to the over-valued assets of AOL, *resulting in AOLTW suffering a loss of approximately $100 billion for 02 – the largest annual corporate loss of all time*! At the same time, Case, the Chairman of AOLTW,

was forced out of the Company. On 3/28/03, AOLTW filed its 02 Form 10-K in which it disclosed that the SEC had informed the Company that its accounting for $400 million in advertising from a deal with Bertelsmann AG was improper. AOLTW has restated its results to eliminate $400 million from its advertising revenues. The SEC ultimately concluded that AOL's accounting for AOL Europe was improper beginning in 3/00, the same 3/00 financial statements which were included in the Merger Registration Statement. The SEC has also investigated AOL's reported subscriber metrics. AOLTW stock now trades at just $17-$18 per share.

44.    As the figures below show, the promised Merger synergies, economies and growth did not occur, as AOL's e-commerce advertising revenues collapsed, its backlog evaporated and its substantial membership stagnated and then fell (in part because AOL began to remove non-paying customers from the subscription number):

|  | 3/31/99 | 6/30/99 | 9/30/99 | 12/31/99 |
|---|---|---|---|---|
| AOL Advertising & Commerce Revenues | $20M | $233M | $350M | $437M |
| EBITDA – AOL | $259M | $343M | 386M | $453M |
| EPS | $0.17 | $0.07 | $0.07 | $0.10 |
| Backlog of Ad Rev | $1.3B | $1.5B | $2.0B | $2.4B |
| AOL Subscribers | 16.9M | 17.6M | 18.7M | 20.5M |
|  | **3/31/00** | **6/30/00** | **9/30/00** | **12/31/00** |
| AOL Advertising & Commerce Revenues | $557M | $609M | $649M | $741M |
| EBITDA – AOL | $492M | $572M | $599M | $652M |
| EPS | $0.17 | $0.13 | $0.13 | $0.01 |
| Backlog of Ad Rev | $2.7B | $3.0B | $3.0B | N/R |
| Subscribers | 22.2M | 23.2M | 24.6M | 26.7M |
|  | **3/31/01** | **6/30/01** | **9/30/01** | **12/31/01** |
| Ad & Commerce Rev – AOLTW | $2.05B | $2.28B | $1.93B | $2.22B |
| AOL Ad & Commerce Rev | $721M | $706M | $624M | $637M |
| EBITDA –AOLTW | $2.1B | $2.5B | $2.5B | $2.8B |
| EBITDA – AOL unit | $684M | $801M | $742M | $718M |
| EPS | ($0.31) | ($0.17) | ($0.22) | $(0.41) |
| Backlog of Ad Rev | N/R | N/R | N/R | N/R |
| AOL Subscribers | 28.8M | 30.1M | 31.3M | 33.2M |

|  | 3/31/02 | 6/30/02 | 9/30/02 | 12/31/02 |
|---|---|---|---|---|
| Ad & Commerce Rev – AOLTW | $1.83B | $2.07B | $1.7B | $2.2B |
| Ad & Commerce Rev – AOL | $497M | $409M | $324M | $388M |
| EBITDA – AOLTW | $2.1B | $2.5B | $2.2B | $2.8B |
| EBITDA – AOL unit | $433M | $473M | $432M | $474M |
| EPS | ($12.25) | $0.09 | $0.01 | ($10.04) |
| Backlog of Ad Rev | N/R | N/R | N/R | $555M |
| AOL Subscribers | 34.6M | 35.1M | 35.3M | 35.2M |

|  | 03/31/03 | 06/30/03 | 09/30/03 | 12/31/03 |
|---|---|---|---|---|
| Ad & Commerce Rev – AOLTW | $1,338 | $1,678 | $1,424 | $1,742 |
| Ad & Commerce Rev – AOL | $240 | $183 | $180 | $184 |
| EBITDA – AOLTW | $1,985 | $2,165 | $2,278 | $2,359 |
| EBITDA – AOL unit | $404 | $431 | $371 | $301 |
| EPS | $0.09 | $0.24 | $0.12 | $0.14 |
| Backlog of Ad Rev | N/R | N/R | N/R | N/R |
| AOL Subscribers | 34,400,000 | 31,500,000 | 31,000,000 | 30,700,000 |

|  | 03/31/04 | 06/30/04 | 09/30/04 | 12/31/04 |
|---|---|---|---|---|
| Ad & Commerce Rev – AOLTW | $1,445 | $1,846 | $1,646 | $2,016 |
| Ad & Commerce Rev – AOL | $228 | $225 | $259 | $295 |
| Operating Income Bef Amortization/Depreciation – AOLTW | $2,413 | $2,637 | $2,392 | $2,428 |
| Operating Income Bef Amortization/Depreciation – AOL Unit | $489 | $487 | $459 | $326 |
| EPS | $0.21 | $0.17 | $0.11 | $0.24 |
| Backlog of Ad Ref | N/R | N/R | N/R | N/R |
| AOL Subscribers | 30,400,000 | 29,700,000 | 29,000,000 | 28,500,000 |

|  | 03/31/05 | 06/30/05 | 09/30/05 |  |
|---|---|---|---|---|
| Ad & Commerce Rev – AOLTW | $1,647 | $2,020 | $1,776 |  |
| Ad & Commerce Rev – AOL | $313 | $319 | $325 |  |
| Operating Income Bef Amortization/Depreciation – AOLTW | $2,595 | $2,570 | $2,601 |  |
| Operating Income Bef Amortization/Depreciation – AOL Unit | $540 | $550 | $481 |  |
| EPS | $0.20 | ($0.07) | $0.19 |  |
| Backlog of Ad Rev | N/R | N/R | N/R |  |
| AOL Subscribers | 28,000,000 | 27,000,000 | 26,200,000 |  |

45.     During 7/00-8/00, when AOL stock was artificially inflated in anticipation of the sale of AOL to another company, as set forth earlier, top AOL insiders sold off some 2.2 million shares of their AOL stock at as high as $58 per share, pocketing over $125 million. Virtually all these shares were acquired by the sellers via the exercise of stock options pursuant to the AOLTW stock option plan.

46.     AOL's acquisition of Time Warner was accomplished through the falsification of AOL's financial results and other false statements and forecasts, and the stock of AOLTW after the Merger was artificially inflated by the continued falsification of AOLTW's financial results and other false statements concerning the success of the Merger, as well as false forecasts of the future profitable growth that would result. The Board of Time Warner and Time Warner's financial advisor failed in their duties and obligations to protect Time Warner shareholders and were grossly negligent if not willfully indifferent to the dangers posed by the acquisition of Time Warner by AOL via merger, as well as the falsifications and manipulations engaged in by AOL to bring about that transaction, while the AOL insiders and AOL's financial advisor were actively seeking to inflate AOL's results and prospects to bring about its purchase of Time Warner, and inflate the stock of AOLTW after the Merger. The former shareholders of Time Warner and those who purchased AOLTW stock after the Merger have suffered billions of dollars of losses, including the plaintiff in this action. But the AOL, Time Warner and AOLTW insiders, named as defendants herein, who brought about this transaction and who manipulated and artificially inflated the price of AOL stock prior to the Merger and AOLTW stock after the Merger have not fared nearly so badly. *They unloaded 23.8 million shares of their AOLTW stock at inflated prices, pocketing over $797 million of illegal insider trading proceeds, while the architect of this fiasco – Levin – walked away from the smoldering ruins with a $625 million retirement package, including $1 million per year to*

*"advise" AOLTW and $400,000 per year for life as a pension*! The graph which follows shows the

AOL, Time Warner and AOLTW stock prices and other key events during the relevant period:

**BLANK PAGE FOR LARGE FOLD-OUT CHART (RYAN K)**

.

## JURISDICTION AND VENUE

47.     The claims asserted herein arise under and pursuant to §§10(b), 14(a) and 20(a) of the

Securities Act of 1934 (the "1934 Act") [15 U.S.C. §§78j(b), 78n(a) and 78t(a)] and Rule 10b-5

promulgated thereunder by the SEC [17 C.F.R. §240.10b-5], §§11, 12(a)(2) and 15 of the Securities

Act of 1933 ("1933 Act") [15 U.S.C. §§77k, 77l(a)(2) and 77o], as well as provisions of state

statutory and common law.  This is an individual action asserting federal and state law claims which

arise from the same operative facts.  Jurisdiction is conferred by §22 of the 1933 Act and §27 of the

1934 Act and venue is proper pursuant to §22 of the 1933 Act and §27 of the 1934 Act and

provisions of state law.   In connection with the acts complained of, defendants used the

instrumentalities of interstate commerce and the U.S. mails.

48.     The violations of law complained of herein occurred in part in this District, including

the dissemination of materially false and misleading statements complained of herein into this

District.  AOLTW has operations located in this District.

## THE PARTIES

**Plaintiff**

49.     Plaintiff Laborers National Pension Fund owned shares of Time Warner and

exchanged those shares for new shares in AOLTW in the Merger.  Plaintiff also purchased AOLTW

shares after the Merger on the open market.  As a result of these transactions, plaintiff has suffered

damages, the details of which will be provided in subsequent discovery in this action.

**Defendants**

50.     (a)     Defendant AOLTW is a corporation which was the issuer of the AOLTW

stock pursuant to the Merger Registration Statement and the Stock Option Registration Statements

(as defined herein in the First Claim for Relief).  AOLTW has since been renamed Time Warner,

Inc.  Defendant AOLTW may be served at 1 Time Warner Center, New York, New York 10019.

(b)     Defendant AOL, founded in 85, was engaged in interactive services, web brands, Internet technologies and electronic commerce ("e-commerce") services. Defendant AOL may be served at 22000 AOL Way, Dulles, Virginia 20166.

(c)     Defendant Time Warner was a media and entertainment company, operating cable networks as well as book, magazine and music publishing businesses, filmed entertainment and digital media. Defendant Time Warner may be served at 1 Time Warner Center, New York, New York 10019.

51.     (a)     Defendant Stephen M. Case ("Case") was Chairman and CEO of AOL prior to the Merger and Chairman of AOLTW after the Merger, until he was forced to resign in early 03. He authorized the signing on his behalf of the Merger Registration Statement. Defendant Case may be served at 1718 M Street Northwest, Unit 249, Washington, DC 20036.

(b)     Defendant Gerald M. Levin ("Levin") was Chairman and CEO of Time Warner prior to the Merger and CEO and a director of AOLTW after the Merger, until he resigned in 12/01 and left the Company in 5/02. He consented to being named a director in the Merger Registration Statement and authorized the signing on his behalf of the Stock Option Registration Statements. Defendant Levin may be served at 435 East 52nd Street, Unit 2C, New York, New York 10022.

(c)     Defendant Richard D. Parsons ("Parsons") was President of Time Warner prior to the Merger and Co-Chief Operating Officer and a director of AOLTW after the Merger, until he was later promoted to Chairman and CEO of AOLTW. He consented to being named a director in the Merger Registration Statement Defendant Parsons may be served at 166 Duane Street, Penthouse, New York, New York 10013.

(d)     Defendant Kenneth J. Novack ("Novack") was Vice Chairman of AOL prior to the Merger and Vice Chairman of AOLTW after the Merger. He consented to being named a

director in the Merger Registration Statement.  Defendant Novack may be served at 81 Beacon Street, Boston, Massachusetts 02108.

(e)     Defendant Robert W. Pittman ("Pittman") was President, Co-Chief Operating Officer and a director of AOL prior to the Merger and Co-Chief Operating Officer and a director of AOLTW after the Merger, until he was forced out of the Company in 7/01.  Also in 4/01, Pittman resumed his prior responsibilities over operations at the AOL subsidiary of AOLTW.  He consented to being named a director in the Merger Registration Statement.  Defendant Pittman may be served at 47 East Lake Drive, Katonah, New York 10536.

(f)     Defendant J. Michael Kelly ("Kelly") was Senior Vice President, Chief Financial Officer and Assistant Secretary of AOL prior to the Merger and Executive Vice President and Chief Financial Officer of AOLTW after the Merger until he was demoted in 11/01 and relieved of his accounting responsibilities.  He signed the Merger Registration Statement and authorized the signing on his behalf of the Stock Option Registration Statements.  Defendant Kelly may be served at 6726 Towne Center Court, McLean, Virginia 22101.

(g)     Defendant Stephen F. Bollenbach ("Bollenbach") was a director of Time Warner before the Merger and a director of AOLTW after the Merger.  He consented to being named a director in the Merger Registration Statement.  Defendant Bollenbach may be served at 600 St. Cloud Road, Los Angeles, California 90077.

(h)     Defendant Wayne H. Pace ("Pace") held multiple executive positions with Time Warner, from 7/93 to 3/01, including that of Chief Financial Officer.  Following the Merger, in 3/01, Pace became Vice Chairman and Chief Financial and Administrative Officer of Turner Broadcasting System, Inc.  In 11/01, Pace became Executive Vice President and Chief Financial Officer of AOLTW.  Defendant Pace may be served at 3131 Habersham Drive, Atlanta, Georgia 30305.

(i)      Defendant Steven Rindner ("Rindner") was Senior Vice President of Business Affairs & Development in 01 for AOL. Defendant Rindner may be served at 10805 Riverwood, Potomac, Maryland 20854.

(j)      Defendant David M. Colburn ("Colburn") was President of AOL's Business Affairs unit, continuing in that position after the Merger, until he was ousted in 8/02. During the time he was President of AOL's Business Affairs unit, Colburn reported directly to defendant Pittman. Colburn was AOL's and AOLTW's chief deal-maker as far as e-commerce advertising was concerned. Colburn has been identified as a subject of DOJ and SEC investigations. Defendant Colburn may be served at 8704 Brickyard Road, Potomac, Maryland 20854.

(k)      Defendant Eric Keller ("Keller") was an executive in AOL's Business Affairs unit, continuing in that position after the Merger, until he was ousted in 6/01. Keller reported directly to defendant Colburn prior to and after the Merger. Keller has been identified as a subject of DOJ and SEC investigations. Defendant Keller may be served at 902 Turkey Run Road, McLean, Virginia 22101.

(l)      Defendant Joseph A. Ripp ("Ripp") was Chief Financial Officer of Time Warner prior to the Merger and Chief Financial Officer of AOLTW's AOL unit after the Merger, until he was replaced in 03. Defendant Ripp may be served at 125 Cannon Drive, Wilton, Connecticut 06897.

(m)      Defendant Barry M. Schuler ("Schuler") was President of AOL's Interactive Services before the Merger and CEO of AOLTW's AOL unit after the Merger, until he was fired. Defendant Schuler may be served at 2181 3rd Avenue, Napa, California 94558.

(n)      Defendant Pascal Desroches ("Desroches") was AOLTW's Assistant Controller since 01 and its Vice President and Deputy Controller since 5/02. Prior to joining the Company, Desroches was a partner at KMPG, L.L.P., and served as a Professional Accounting

- 42 -

Fellow with the SEC's Office of the Chief Accountant. Desroches was a chief participant in the Company's internal "CFO Review." In 3/04, the SEC issued a Cease and Desist Order regarding his violations of federal securities laws relating to his role in the accounting treatment of AOL advertising revenue pertaining to the Bertelsmann transactions. Defendant Desroches my be served at 90 Yale Terrace, Blauvelt, New York 10913.

(o)     Defendant John P. Tuli ("Tuli") was a Vice President in the NetBusiness unit at AOL. Among other responsibilities, Tuli managed the development of the NetBusiness platform of which PurchasePro's marketplace was a key component. On 1/10/05, Tuli was indicted on federal charges of securities fraud, conspiracy, making false statements to auditors, and wire fraud. Defendant Tuli may be served at 60 North Avenue, Weston, Massachusetts 02493.

(p)     Defendant Myer Berlow ("Berlow") was Vice President for National Accounts at AOL. Subsequently, he became President of AOL's Worldwide Interactive Marketing Division in the Business Affairs unit. Following the Merger, he became President of the Global Marketing Solutions Group under the direction of "AOL Time Warner's Advertising Council Body," which is comprised of the top sales executive in each of AOL Time Warner's divisions. Defendant Berlow may be served at 159 East 61st Street, New York, New York 10021.

(q)     Defendant Paul T. Cappuccio ("Cappuccio") was Senior Vice President and General Counsel of AOL from 8/99 until the Merger. Upon the Merger, Cappuccio became Executive Vice President, General Counsel and Secretary of AOLTW. Cappuccio authorized the signing on his behalf of the Merger Registration Statement and Stock Option Registration Statements. Defendant Cappuccio may be served at 27 East Dilido Drive, Miami, Florida 33139.

52.     Each of the named defendants in ¶51(a)-(q) (the "Individual Defendants") participated in the Merger by, among other things, preparing, reviewing and/or signing or

authorizing the signing of the Merger Registration Statement and the Stock Option Registration Statements.

(a)     Defendant CitiGroup Inc. is a large integrated financial services institution that through subsidiaries and divisions (such as defendant Salomon Smith Barney Inc., a division of defendant CitiGroup Global Markets, Inc.) (collectively "Salomon Smith Barney") provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities. Salomon Smith Barney acted as financial advisor to AOL in connection with the Merger, helping to craft and circulate the false and misleading Merger Registration Statement. Salomon Smith Barney issued false and misleading reports on AOL prior to the Merger and AOLTW subsequent to the Merger, which helped to artificially inflate the market prices of AOL and AOLTW stocks. Defendant CitiGroup Inc. may be served at 399 Park Avenue, New York, New York 10043. Defendants CitiGroup Global Markets, Inc. and Salomon Smith Barney Inc. may be served at 388 Greenwich Street, New York, New York 10013.

(b)     Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") is an integrated financial services institution that provides commercial and investment banking services, commercial loans to corporate entities, and acts as underwriter in the sale of corporate securities. Morgan Stanley acted as financial advisor to Time Warner in connection with the Merger and issued a false opinion that the Merger was fair to Time Warner and its shareholders. Morgan Stanley also issued false and misleading reports on Time Warner and AOL prior to the Merger, which helped to artificially inflate the prices of Time Warner and AOL stocks prior to the Merger and bring about the Merger, and on AOLTW after the Merger, which artificially inflated the market price of AOLTW stock. Defendant Morgan Stanley may be served at 1585 Broadway, New York, New York 10036.

(c)     Salomon Smith Barney and Morgan Stanley, as the financial advisors that helped bring about this disastrous Merger, pocketed the largest investment banking fee in history for

helping orchestrate this deal, by issuing false reports on the impact of the Merger and AOL's, Time Warner's and AOLTW's businesses and, in the case of Morgan Stanley, a false opinion that the terms of the sale of Time Warner to AOL via the Merger was "fair" to the Time Warner shareholders. These fees – over $135 million – were designed to and did motivate these financial advisors to do whatever was necessary to bring about the close of the Merger and support – inflate – the price of AOL's and Time Warner's stock before, and AOLTW's stock after, the Merger. For instance, Salomon Smith Barney, after getting $5 million at the signing of the Merger deal, got $7.5 million when Time Warner's shareholders voted to approve the Merger, and another $47.5 million when the deal closed. Morgan Stanley got $17.5 million when the deal was signed, another $42.5 million when the Merger closed *and another $15 million if the new AOLTW stock traded at certain high levels in the several days after the Merger*. Thus, both Salomon Smith Barney and Morgan Stanley had enormous economic motives to bring about Time Warner shareholder approval of the Merger, get the Merger closed, and inflate AOL's and AOLTW's stock prices. But, worst of all, in violation of SEC standards and regulations and court decisions prohibiting indemnity agreements to hold persons harmless of their liability under the securities laws, both these investment advisors involved in the Merger forced AOL and Time Warner (and AOLTW) to agree to hold them harmless, *i.e.*, indemnify them against any exposure or liability arising from their participation in the Merger. These illegal indemnity agreements purported to immunize Salomon Smith Barney and Morgan Stanley from their important legal obligations of due diligence and honesty to protect the investors involved in this Merger and enabled them to disregard or act in denigration of their duties of honesty and/or diligence.

53.    On and after the closing of the Merger, Morgan Stanley and Salomon Smith Barney were constantly buying and selling AOLTW stock in their own proprietary trading accounts as well as accounts they managed for other entities and investors.

54.     Defendant Ernst & Young LLP ("Ernst & Young") was AOL's, Time Warner's and AOLTW's supposedly independent accountant and provided accounting services for AOL, Time Warner and AOLTW prior to, in connection with, and after the Merger, which included "clean" or "unqualified" opinions on AOL's, Time Warner's and AOLTW's 98, 99, 00 and 01 annual audited financial statements. Ernst & Young also reviewed and approved the unaudited financial statements of AOL and Time Warner issued in connection with the Merger, including those in the Merger and Stock Option Registration Statements, and also including the "pro forma" AOLTW financial statements included in the Merger and Stock Option Registration Statements. Ernst & Young was not independent with respect to the Merger, as it was the accountant for both AOL and Time Warner and had been promised it would be the auditor/accountant for the gigantic new Company – AOLTW – after the Merger and thus would garner huge amounts of accounting, auditing and consulting fees post-merger for years to come. Defendant Ernst & Young may be served at 5 Times Square, 14th Floor, New York, New York 10036.

## FRAUDULENT SCHEME AND CONDUCT

55.     Each defendant is liable for making false statements, or for failing to disclose adverse facts while selling and/or offering to sell AOLTW securities, and/or for willfully participating in a scheme to defraud and/or aiding and abetting such illegal conduct, which damaged Time Warner's shareholders in the Merger and purchasers of AOLTW's stock after the Merger (the "Wrongful Conduct"). This Wrongful Conduct enabled AOLTW to issue (sell) over four billion newly issued shares of AOLTW stock in the Merger and over 108 million additional shares pursuant to the AOLTW stock option plan thereafter, allowed the AOL and AOLTW insiders to sell 23.8 million shares of AOL or AOLTW stock at artificially inflated prices for over $797 million in illegal insider trading proceeds and obtain hundreds of millions of dollars in additional retirement or deferred compensation, allowed the financial advisors to pocket some $135 million in merger advisory fees

- 46 -